UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 17-235 JGB (SPx)** | | Date | March 26, 2021 |
|---|---|---|---|---|
| Title | ***John Baleja v. Northrop Grumman Space and Mission Systems Corp. Salaried Pension Plan, et al.*** | | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:       **Order (1) GRANTING-IN-PART and DENYING-IN-PART Defendants' Motion for Summary Judgment (Dkt. No. 153); (2) DENYING Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 155); (3) GRANTING Motions to File Under Seal (Dkt. Nos. 151, 156, 169, 176, 181); and (4) VACATING the March 29, 2021 hearing. (IN CHAMBERS)**

Before the Court are cross motions for summary judgment.  ("Defendants' Motion," Dkt. No. 153; "Plaintiff's Motion," Dkt. No. 155.)  The Court finds these matters appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  Upon consideration of the papers filed in support of and in opposition to the Motions, the Court GRANTS-IN-PART and DENIES-IN-PART Defendant's Motion; DENIES Plaintiff's Motion; and VACATES the March 29, 2021 hearing.

## I.  BACKGROUND

On February 8, 2017, Plaintiff John Baleja filed a complaint against Defendants Northrop Grumman Space and Mission Systems Corp. Salaried Pension Plan, Northrop Grumman Benefit Plans Administrative Committee, Northrop Grumman Corporation, and Doe Defendants (collectively, "Defendants").  ("Complaint," Dkt. No. 1.)  Plaintiff amended his Complaint as of right, filing a First Amended Complaint on May 12, 2017.  ("FAC," Dkt. No. 32.)  After the Court dismissed the FAC, Plaintiff filed a Second Amended Complaint.  ("SAC," Dkt. No. 48; see also Dkt. No. 44.)  The SAC alleges three claims against Defendants brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"): (1) equitable relief (1986 Plan);

(2) benefits payment (1986 Plan); and (3) equitable relief and benefits payment (1981 Plan). (SAC.)  Defendants moved to dismiss all three claims, and the Court dismissed Plaintiff's third claim for equitable relief and benefits payment for the 1981 Plan.  ("SAC Order," Dkt. No. 61.) The Court denied leave to amend, and the parties proceeded to discovery on the first two claims. (Id.)

On March 26, 2020, the Court granted Plaintiff's Motion for Class Certification, certifying a class of "all persons, excluding Defendants, whose accrued pension benefits at any time from December 31, 1984 up to and including the date of class certification in this action, were reduced by Defendants due to the ESL Offset" (the "Class").  (Dkt. No. 109.)

On July 20, 2020, Plaintiff and Defendants each separately filed Motions for Summary Judgment.  (Defendants' Motion; Plaintiff's Motion.)  Accompanying Defendants' Motion are the following:

-   Statement of Undisputed Facts ("DSUF," Dkt. No. 153-2);
-   Declaration of William E. O'Neil ("William O'Neil Declaration," Dkt. No. 153-3);
-   Exhibits 1-62 in Support of the William O'Neil Declaration (Dkt. Nos. 153-4 – 153-65);
-   Declaration of Mary F. O'Neill ("Mary O'Neill Declaration," Dkt. No. 153-66);
-   Declaration of Kenneth Raymond (Raymond Declaration," Dkt. No. 153-67);
-   Exhibit in Support of Raymond Declaration (Dkt. No. 153-68);
-   Declaration of Sheryl Fleshin ("Fleshin Declaration," Dkt. No. 153-69); and
-   Exhibits 1-9 in Support of Fleshin Declaration (Dkt. Nos. 153-70 – 153-78).

Accompanying Plaintiff's Motion, which is a Partial Motion for Summary Judgment, are the following:

-   Declaration of Shaun P. Martin ("Martin Declaration," Dkt. No. 155-2);
-   Exhibits A-N to the Martin Declaration (Dkt. Nos. 155-3 – 155-16); and
-   Statement of Undisputed Facts ("PSUF," Dkt. No. 155-17).

Defendants opposed Plaintiff's Motion on August 18, 2020.  ("Defendants' Opposition," Dkt. No. 165.)  In support of their Opposition, Defendants also filed:

-   Statement of Genuine Dispute of Material Fact ("DSUF Reply," Dkt. No. 165-1);
-   Objections to Plaintiff's Evidence (Dkt. No. 165-2);
-   Declaration of C. William Phillips ("Phillips Declaration," Dkt. No. 165-3);
-   Exhibits 1-3 in Support of Phillips Declaration (Dkt. Nos. 165-4 – 165-6); and
-   Declaration of Jarrod Cronin (Dkt. No. 165-7).

Plaintiff opposed Defendants' Motion on September 1, 2020.  ("Plaintiff's Opposition," Dkt. No. 168.)  In support of his Opposition, Plaintiff also filed:

-   Statement of Genuine Disputes of Material Fact ("PSUF Reply," Dkt. No. 168-1);

- Objections to Defendants' Evidence (Dkt. No. 168-2);
- Second Declaration of Shaun P. Martin ("Second Martin Declaration," Dkt. No. 168-3);
- Exhibits A-Z to the Second Martin Declaration (Dkt. Nos. 168-4 – 168-29);
- Declaration of John Baleja ("Baleja Declaration," Dkt. No. 168-30);
- Declaration of Fred Formosa ("Formosa Declaration," Dkt. No. 168-31);

Plaintiff also filed declarations from the following class members:

- Barbara McDonald (Dkt. No. 168-32);
- David Attard (Dkt. No. 168-33);
- Dora Brogden (Dkt. No. 168-34);
- Douglas Rinehart (Dkt. No. 168-35);
- Edward Harmon (Dkt. No. 168-36);
- Manuel Pindrock (Dkt. No. 168-37);
- Mark Capers (Dkt No. 168-38);
- Mary Danze (Dkt. No. 168-39);
- Michael Gialdini (Dkt. No. 168-40);
- Rodolfo Salazar (Dkt. No. 168-41); and
- Cheri McLaggen (Dkt No. 168-42) (cumulatively, "Declarants").

On September 21, 2020, Defendants filed a Motion to Strike declarations of Declarants pursuant to Federal Rule of Civil Procedure 37(c)(1).  (Dkt. No. 178.)  On October 29, 2020, the Court denied the Motion to Strike.  (Dkt. No. 191.)

On September 22, 2020, Defendants replied to Plaintiff's Opposition.  ("Defendants' Reply," Dkt. No. 179.)  In support of Defendants' Reply, they also filed:

- Response to PSUF Reply (Dkt. No. 179-1);
- Objections to Plaintiffs' Evidence (Dkt. No. 179-2);
- Declaration of Nicholas O. Pastan ("Pastan Declaration," Dkt. No. 179-3); and
- Exhibits 1-6 to the Pastan Declaration (Dkt. Nos. 179-4 – 179-9).

On September 22, 2020, Plaintiff replied to Defendants' Opposition.  ("Plaintiff's Reply," Dkt. No. 180.)  In support of Plaintiff's Reply, he also filed:

- Third Declaration of Shaun Martin (Dkt. No. 180-1);
- Exhibits in Support, (Dkt. Nos. 180-2 – 180-10).

Both parties have filed requests to file documents associated with the Motions under seal. (See, e.g., Dkt. Nos. 151, 156, 169, 176, 181.)  All requests to file documents under seal are GRANTED and all documents are considered properly filed.

## II.   FACTS

### A.  Undisputed Facts

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for purposes of the Motion.  See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

#### 1.  The ESL Plan

ESL was a defense contractor that designed and developed data systems for reconnaissance and communications applications. (Dkt. No. 179-1 ¶ 1.)  In 1978, ESL was acquired by TRW, Inc. ("TRW") and became a wholly-owned subsidiary of TRW.  (Id. ¶¶ 2-3.)  At the time of its acquisition, ESL maintained a retirement plan for its employees called the ESL Plan, which was a defined contribution plan under the Employee Retirement Income Security Act of 1974 ("ERISA").  (Id. ¶¶ 4-5.)  Pursuant to the terms of the ESL Plan, ESL contributed a fixed percentage of each employee's salary into an individual retirement account for that employee.  (Id. ¶ 6.)  ESL employees were also authorized to make voluntary contributions.  (Id. ¶ 7.)

#### 2.  The 1985 TRW Plan

In 1984, the ESL Plan was terminated and ESL employees previously on the ESL Plan were transferred to the TRW Salaried Pension Plan (the "TRW Plan").  (Dkt. No. 179-1 ¶ 8.)  The TRW Plan was also a defined benefit plan under ERISA and a defined contribution plan.  (Id. ¶¶ 9, 11.)  ESL and TRW planned to transition ESL employees to the TRW Plan in a process which entailed three separate steps.  (Id. ¶ 14.)  The steps in the process were: (1) terminate the ESL plan; (2) transfer ESL employees into the TRW Plan; and (3) distribute employees' ESL plan balances.  (Id. ¶ 15.)  The ESL Plan was terminated as of December 31, 1984.  (Id. ¶ 16.)  The TRW Plan was restated and amended, effective as of January 1, 1985, to incorporate ESL employees into the TRW Plan (the "1985 TRW Plan").  (Id. ¶ 18.)  The 1985 TRW Plan was executed on December 19, 1985, but was made retroactive to January 1, 1985.  (Id. ¶¶ 19-20.)  In August 1985, some ESL employees received a check based upon their balance in the former ESL Plan, but some class members have submitted declarations saying they do not recall receiving an ESL Plan distribution.  (Id. ¶ 35.)

The 1985 TRW Plan reads, in part:

D.  Computation of Benefits
1.  Normal Retirement Benefits. The monthly normal retirement benefit of an eligible Participant shall be computed in the following manner:
    a.  40% of his Earnings;
    b.  less 50% of the amount by which the Estimated Primary Social Security Amount exceeds $450.00;

c.  increased by a percentage of his Earnings equal to .5% multiplied by his Years of
Benefit Service in excess of 30, or reduced by 1/360th for each month by which
the number of his months of Benefit Service is less than 360, if any; and
d.  reduced by the amount listed opposite the Participant's name in Appendix J,
said amount representing the age 65 actuarial annuity value of the Participant's
account balance accrued under either the ESL Retirement Fund or the TRW
Microwave Inc. Retirement Account Plan, excluding, for offset purposes, in the
case of the ESL Retirement Fund, that portion of the account balance consisting
of employee contributions or any amount rolled over from another tax-qualified
pension plan.

(Dkt. No. 165-1 ¶ 1.)

Section D.1.d of the 1985 Plan, also known as the ESL Offset Provision, does not contain
the term "8.5 percent," nor does it contain the term "interest rate." (Id. ¶¶ 3-4.)  It does,
however, refer to an "Appendix J."  (Dkt. No. 197-1 ¶ 47.)  At the time of the 1985 TRW Plan's
execution, it was TRW's intention to create a plan appendix that would include: (i) the names of
ESL and Microwave employees; and (ii) the ESL Offset or Microwave Offset amounts applicable
to each employee's benefits.  (Id. ¶ 48.)[1]  Appendix J was never completed in this way, though a
version of the document which did not include a list of ESL employees was completed. (Id. ¶
49.)

The 1985 TRW Plan also contained a "no duplication of benefits" provision.  (Dkt. No.
197-1 ¶ 32.)  The no duplication of benefits provision provided that: "With respect to any
Participant, there shall be no duplication of any pension benefits payable under this Plan or any
defined benefit or defined contribution plan (other than The TRW Stock Savings Plan)
maintained, or contributed to, by any member of the Controlled Group or any predecessor
thereof, the amount of which is based in whole or in part on the same period of his employment
with any member of the Controlled Group or any predecessor thereof. Benefits otherwise payable
with respect to him under this Plan shall be appropriately reduced (as determined by TRW Inc.)
to prevent any such duplication except to the extent that benefits with respect to him under such
other plan are appropriately reduced or are stated or clearly intended to be in addition to benefits
under this Plan." (Id. ¶ 33.)  For purposes of this provision, ESL was a member of the
"Controlled Group."  (Id. ¶ 34.)

In 1985, employees of TRW Microwave, Inc., ("Microwave,") another subsidiary of
TRW, were transferred into the 1985 TRW Plan.  (Id. ¶¶ 40-41.)  Microwave employees'
benefits under the 1985 TRW Plan were subject to a pension offset (the "Microwave Offset").
(Id. ¶ 42.)

Jacob Schoeppler was TRW's Director of Pension Benefits in 1986.  (Id. ¶ 50.)  Barbara
Nahra was TRW's ERISA Counsel in 1986.  (Id. ¶ 51.)  On March 12, 1986, Mr. Schoeppler sent

---

[1] Nominally disputed but factually agreed upon.

Ms. Nahra a list of Microwave employees and Microwave Offset amounts. (<u>Id.</u> ¶ 52.)  The list of Microwave employees and Microwave Offset amounts that Mr. Schoeppler provided on March 12, 1986 was not a final version of Appendix J. (<u>Id.</u> ¶ 53.)[2]  The list of Microwave employees and Microwave Offset amounts that Mr. Schoeppler provided on March 12, 1986 was accompanied by a cover memorandum. (<u>Id.</u> ¶ 54.)  Mr. Schoeppler's cover memorandum read: "I enclose a listing of the Microwave people who received their account balances as a consequence of terminating the Microwave Retirement Account Plan and providing coverage under the TRW Salaried Pension Plan. Our intent was to include this material as an Appendix to the Salaried Plan and I suggest that be done at the next convenient point in time. I plan to provide you a similar list for ESL people as soon as possible." (<u>Id.</u> ¶ 55.)  In 1985 and 1986, Mr. Schoeppler did not have the information necessary to generate Appendix J for ESL employees. (<u>Id.</u> ¶ 56.)

Mr. Schoeppler contacted ESL on a number of occasions to obtain the information he needed to create a list of ESL employees and ESL Offset amounts. (<u>Id.</u> ¶ 57.)  Whether he ever received the information he needed to create a list of ESL employees and ESL Offset amounts is in dispute, but it is undisputed that he did not create such a list. (<u>Id.</u> ¶ 58.)

On June 28, 1989, Ms. Nahra circulated Mr. Schoeppler's March 12, 1986 cover memorandum and list of Microwave employees and Microwave Offset amounts to certain TRW benefits personnel. (<u>Id.</u> ¶ 59.)  Ms. Nahra included a cover memorandum to her June 28, 1989 circulation, which read: "The attached list for Microwave is all I have in the Law Department reflecting the age 65 annuity values. Did Chris Smith ever provide Jake a list? What is being used when an ESL person retires? Please advise." (<u>Id.</u> ¶ 60.)

### 3.  The 1989 TRW Plan

On December 20, 1989, the TRW Plan was amended and restated, effective as of January 1, 1989 (the "1989 TRW Plan"). (<u>Id.</u> ¶ 61.)  The 1989 TRW Plan did not reference Appendix J. (<u>Id.</u> ¶ 62.)  The 1989 TRW Plan provided that: "The Accrued Benefit of any Participant at his Retirement Date shall be reduced by the amount which represents the age 65 annuity value of the Participant's account balance under the ESL Retirement Fund, excluding for offset purposes, that portion of the account balance consisting of employee contributions or any amount rolled over from another tax-qualified pension plan." (<u>Id.</u> ¶ 63.)  To date, the only version of Appendix J identified by Defendants is the list of Microwave employees and Microwave offset amounts that Mr. Schoeppler circulated on March 12, 1986. (<u>Id.</u> ¶ 64.)  The parties dispute whether or not this version is considered an incomplete draft or something final which was incorporated into the Plan as written. (<u>Id.</u> ¶ 65.)  There is no version of Appendix J that includes the names of ESL employees and ESL Offset amounts. (<u>Id.</u> ¶ 66.)  There is no version of Appendix J that was ever distributed to any ESL employee. (<u>Id.</u> ¶ 67.)

---

[2] Nominally disputed but factually agreed upon—the document sent to Ms. Nahra, which may or may not be considered Appendix J, did not include any ESL employee names.

**CIVIL MINUTES—GENERAL**                      Initials of Deputy Clerk <u>NP</u>

The parties dispute whether calculation of the ESL Offset is an actuarially equivalent calculation. (Id. ¶ 81.) However, it is undisputed that the 1985 TRW Plan provides a definition of "Actuarial Equivalent" which reads: "'Actuarial Equivalent' means a benefit having an equal value when computed on the basis of an eight and one-half percent (8-1/2%) interest assumption and on the 1971 Group Annuity Mortality Table adjusted to a unisex basis for a Participant population deemed to be two- thirds (2/3) male and one-third (1/3) female." (Id. ¶¶ 82-83.)

It is also disputed whether under the 1985 TRW Plan, the ESL Offset was calculated using an 8.5% interest rate. (Id. ¶ 84.) However, it is undisputed that the 1985 TRW Plan pro-vides a definition of "Interest" which provides that "Interest" means: "(i) for periods after January l, 1976 and prior to January 1, 1981, five percent (5%); and (ii) for periods after January 1, 1981 and until determined otherwise, eight and one-half percent (8-1/2%)." (Id. ¶¶ 86-87.)

Benefits under the 1985 TRW Plan were subject to a post-retirement cost-of-living adjustment ("COLA"). (Id. ¶ 96.) However, the 1989 TRW Plan eliminated the post-retirement COLA applicable to benefits under the TRW Plan. (Id. ¶ 98.) For benefits earned after January 1, 1989, the ESL Offset was calculated without reference to any COLA assumption. (Id. ¶ 99.)

The 1989 TRW Plan provides a definition of "Actuarial Equivalent," which means "a benefit having an equal value when computed on the basis of an eight and one-half percent (8-1/2%) interest assumption and on the 1971 Group Annuity Mortality Table adjusted to a unisex basis for a Participant population deemed to be two- thirds (2/3) male and one-third (1/3) female." (Id. ¶¶ 100-101.)

It is disputed whether under the 1989 TRW Plan, the ESL Offset was calculated using an 8.5% interest rate. (Id. ¶ 102.) However, it is undisputed that under the 1989 Plan, the ESL Offset was calculated using the 1971 Group Annuity Mortality Table adjusted to a unisex basis for a Participant population deemed to be two-thirds male and one-third female. (Id. ¶ 103.)

It remains disputed whether Defendants used an interest rate of 8.5% to calculate the ESL Offset. (Id. ¶¶ 105-106.)

### 4. The 1985 SPD

In 1984 or 1985, at least some TRW employees were furnished with a summary plan description (the "1985 SPD"). (Id. ¶ 114.) The parties dispute whether the 1985 SPD "disclosed" the ESL Offset and whether all employees received the 1985 SPD. (Id.) The 1985 SPD contained language stating: "This section provides a summary description of the TRW salaried pension plan as of Jan. 1, 1985," though Plaintiffs dispute the truth of the matter asserted. (Id. ¶ 118.) The 1985 SPD also contained language stating that the "ESL retirement account plan will be terminated as of December 31, 1984, and future pension coverage will be provided for ESL and RGM employees starting on January 1, 1985 under the TRW Salaried Pension Plan (the plan)." (Id. ¶ 119.) It also stated: "If you were a participant in the ESL plan

(which also applied to RGM employees) on December 31, 1984, you will be fully vested in your account as of that date, and that balance will be paid to you." (Id. ¶ 120.) It also stated: "Subject to the service starting dates noted in the Service section of this booklet, the [TRW] plan will credit employment by ESL or RGM as service for both benefit and vesting purposes." (Id. ¶ 121.)

The parties dispute whether the 1985 SPD "disclosed" the ESL Offset in accordance with ERISA, but it seems to be undisputed that the 1985 SPD provided some information about the ESL Offset. (Id. ¶ 122.) The 1985 SPD contained language which said "the monthly pension benefit which could be provided to you at age 65 by the terminated [ESL] plan's account balance will offset (serve to reduce) the amount produced by the plan's normal retirement benefit formula." (Id. ¶ 123.) The parties also dispute whether it was disclosed that the ESL Offset could eliminate an ESL employee's benefit under the TRW Plan, however, it is undisputed that the 1985 SPD contained language which said that if "the annuity value of [the] ESL account balance exceeds the amount produced by the plan's formula, there will be no further benefit from the plan." (Id. ¶ 125.)

Within the 1985 SPD, there was a section entitled "Normal Retirement," which provided three potential benefits calculations under the TRW Plan which referenced the ESL Offset. (Id. ¶¶ 127-28.) The 1985 SPD also provided that the TRW Plan "is covered by the Employee Retirement Income Security Act of 1974" which "requires that plan documents, including the plan description, trust agreement, and summary financial report be made available for your review in the Employee Relations Department. By making written request to the plan's Board of Administration you are also entitled to receive copies of those documents. There will be a reasonable charge for the plan description and the trust agreement. ERISA also gives you the right to request and receive—once each year—a statement giving your accrued benefit, and indicating that you are or are not vested, and if not vested, notice of the earliest date on which you could have a non-forfeitable right to a benefit." (Id. ¶¶ 129-130.)

### 5.   The ESL Pamphlet

It is disputed whether ESL employees were provided with an explanatory pamphlet ("ESL Pamphlet") around the time of their transition from the ESL Plan to the TRW Plan, but it is not disputed that such a pamphlet exists. (Id. ¶ 134.) The ESL Pamphlet is not completely identical to the 1985 SPD. (Id. ¶ 135.) The ESL Pamphlet contains a portion which provides: "The ESL retirement account plan will be terminated as of December 31, 1984, and future pension coverage will be provided for ESL and RGM employees starting on January 1, 1985 under the TRW Salaried Pension Plan (the plan)." (Id. ¶ 137.) It continues: "If you were a participant in the ESL plan . . . on December 31, 1984, you will be fully vested in your account [under the ESL Plan] as of that date, and that balance will be paid to you." (Id. ¶ 138.) It also states: "Subject to the service starting dates noted in the Service section of this booklet, the [TRW] plan will credit employment by ESL or RGM as service for both benefit and vesting purposes." (Id. ¶ 139.) Thought the parties dispute whether this language constitutes "disclosure" of the ESL Offset for the purposes of ERISA, it is undisputed (and indeed, indisputable) that the ESL

Pamphlet disclosed that "the monthly pension benefit which could be provided to you at age 65 by the terminated [ESL] plan's account balance will offset (serve to reduce) the amount produced by the plan's normal retirement benefit formula." (Id. ¶ 141.)  The ESL Pamphlet also contains a section stating that "if the annuity value of ESL account balance exceeds the amount produced by the plan's formula, there will be no further benefit from the plan." (Id. ¶ 143.)  The parties dispute whether this language disclosed that the ESL Offset could completely eliminate an ESL employee's benefit under the TRW Plan. (Id.)

### 6.  ESL in Brief

It is undisputed that ESL circulated a weekly employee newsletter titled ESL in Brief, but it is disputed whether all ESL employees received this publication. (Id. ¶ 144.)  While Plaintiffs dispute whether the version of the 1984 ESL Brief Defendants have included as Exhibit 23 is a final document which was distributed to ESL employees, it is indisputable that the document says: "It is important to remember that all distributions from the ESL Retirement Fund will be considered in determining your benefit from the new plan. When you retire, the 1985 distribution will be converted to its equivalent normal retirement benefit (an annuity*) and deducted from your salaried pension plan benefit." (Id. ¶ 148.)  Subject to Plaintiff's objections, the 1984 ESL Brief included as Exhibit 22 reflected the ESL Offset. (Id. ¶ 150.)

### 7.  Jim Sandstrom Memo

Defendants have produced a document which is a letter from Jim Sandstrom, ESL's Vice President of Finance, to J. William Murray, an ESL employee, dated April 9, 1985. (Id. ¶¶ 152-53.)  It is disputed whether other ESL employees received the same or similar letters. (Id.)  However, Mr. Sandstrom's letter provided Mr. Murray an estimate of his account balance as of December 31, 1984; it also attached a "Pension Offset Worksheet" and a table of conversion factors. (Id. ¶¶ 155-57.)

### 8.  Other Methods of Disclosure

Paul Swain was ESL's Benefits Manager in 1985. (Id. ¶ 162.)  Mr. Swain held retirement training sessions in connection with the transition of ESL employees from the ESL Plan to the TRW Plan. (Id. ¶ 163.)  In 1985, ESL also held an investment fair in connection with the transition from the ESL Plan to the TRW Plan. (Id. ¶¶ 166-67.)  ESL employees who were age 55 years or older could request pension benefit estimates from ESL or TRW. (Id. ¶ 172.)

Though it is disputed whether all ESL employees received an SPD in 1993, TRW provided at least some TRW Plan participants with an SPD that year. (Id. ¶ 174.)  And though it is also disputed whether the 1993 SPD "disclosed" the ESL Offset within the meaning of ERISA, it is undisputed that the it said: "If you were employed at a location which was acquired by TRW (e.g. ESL or Firestone) and service credited under a prior retirement income plan is also credited under this Plan, the monthly benefit value of the other plan will be subtracted from the benefit under this Plan. For example, if the monthly life only pension benefit for all years of service is

$800 and you receive (or received) the equivalent of a $200 monthly benefit from the prior plan, your net TRW Pension Plan benefit is $600 ($800 - $200)." (Id. ¶ 176.)

And though it is also disputed whether all ESL employees received an SPD in 1995, TRW provided at least some TRW Plan participants with an SPD that year. (Id. ¶ 177.) Of course, it is also disputed whether the 1995 SPD "disclosed" the ESL Offset within the meaning of ERISA, but it is undisputed that it said: "If you were employed at a location which was acquired by TRW (e.g. ESL or Firestone) and service credited under a prior retirement income plan is also credited under this Plan, the monthly benefit value of the other plan will be subtracted from the benefit under this Plan. For example, if the monthly life only pension benefit for all years of service is $800 and you receive (or received) the equivalent of a $200 monthly benefit from the prior plan, your net TRW Pension Plan benefit is $600 ($800 - $200)." (Id. ¶ 179.)

All of the same—including the parties' dispute regarding distribution and disclosure—is true of the 1999 SPD, which contained the same quoted language as the 1993 and 1996 SPDs. (Id. ¶¶ 180-82.) The same is also true of the 2000 SPD, which contained the same quoted language as the 1993, 1996, and 1999 SPDs and is subject to the same dispute about distribution and disclosure. (Id. ¶¶ 183-85.) All the same is true of the 2001 SPD. (Id. ¶¶ 186-88.) All the same is also true about the 2008 SPD, with the only difference being that Northrop provided it. (Id. ¶¶ 189-191.)

The parties dispute whether, in the 1990s, when a TRW Plan participant terminated employment with ESL or TRW, it was TRW's practice to provide the terminated employee with a deferred vested right ("DVR") notice. (Id. ¶ 192.) However, a notice of that type was produced by Defendants and contains language that says: "Your age 65 benefit will be subject to reduction for the ESL prior plan benefit." (Id. ¶ 194.)

In the 1990s, TRW's Benefits Department received inquiries from some ESL employees about their benefits. (Id. ¶ 197.) How the Benefits Department answered such inquiries is disputed. (Id. ¶ 198.) As of recently, TRW Plan participants can request pension benefit estimates online. (Id. ¶ 199.)

### 9.  Plaintiff John Baleja

Plaintiff John Baleja began working for ESL in 1982. (Id. ¶ 204.) He was a participant in the ESL Plan. (Id. ¶ 205.) In August 1985 when the ESL Plan terminated, Mr. Baleja received a cash payout of $4,078.14. (Id. ¶ 206.) Mr. Baleja became a participant in the TRW Plan as of January 1, 1985. (Id. ¶ 207.) Mr. Baleja's ESL Offset was calculated using an 8.5% interest rate. (Id. ¶ 209.) From 1982 to 1987, Mr. Baleja worked remotely at Norton Air Force Base, outside of San Bernardino, California; he did not work at ESL's headquarters in Sunnyvale, California. (Id. ¶¶ 210-11.)

In 1982, Mr. Baleja was one of three ESL employees working at Norton Air Force Base, but by 1985, Mr. Baleja was the only one of the original three ESL employees stationed at Norton

Air Force Base still working there.  (<u>Id.</u> ¶¶ 212-13.)  At no point during Mr. Baleja's tenure at Norton Air Force Base was there ever more than 10 ESL employees working at Norton Air Force Base.  (<u>Id.</u> ¶ 214.)  It is undisputed for the purposes of the Motions that Mr. Baleja received copies of the 1985 SPD, the ESL Pamphlet, and the 1985 TRW Plan.  (<u>Id.</u> ¶¶ 215-18.)  Mr. Baleja did not receive a copy of Appendix J, nor has he ever seen a copy of Appendix J.  (<u>Id.</u> ¶¶ 219-20.)  Mr. Baleja did not attend any meetings or presentations regarding ESL employees' transition from the ESL Plan to the TRW Plan; nor did he attend any retirement trainings or the investment fair.  (<u>Id.</u> ¶¶ 221-23.)

In 1995, Mr. Baleja's employment with TRW was terminated; he received a DVR Notice.  (<u>Id.</u> ¶¶ 224-25.)  The DVR notice that Mr. Baleja received in 1995 stated: "Your age 65 benefit will be subject to reduction for the ESL prior plan benefit."  (<u>Id.</u> ¶ 226.)

In 2009, Mr. Baleja requested a benefit estimate from Northrop.  (<u>Id.</u> ¶ 227.)  On August 21, 2009, Northrop mailed Mr. Baleja a "Calculation Summary(s) for the Benefit Estimate(s)" he requested (the "Calculation Summary").  (<u>Id.</u> ¶ 228.)  Mr. Baleja received the Calculation Summary in or around August 2009.  (<u>Id.</u> ¶ 229.)  The Calculation Summary disclosed that the ESL Offset amount applicable to Mr. Baleja's benefit at age 65 would be $471.26.  (<u>Id.</u> ¶ 231.)

On March 6, 2014, Mr. Baleja emailed Keith Maw, a former coworker at ESL, regarding his benefit under the Northrop Plan.  (<u>Id.</u> ¶¶ 232-33.)  In this email, Mr. Baleja wrote, "As you know[,] when TRW bought ESL, they cashed out ESL's s own pension plan. . . . NG told me if I hadn't received the ESL pension payout, I would have received just under $1300 a month from Northrup Grummon TRW pension fund. Because I got the $3000 payout, Northrup Grummon will pay me about $400 less each month from when I turn 65 in 2016 for the duration of my life."  (<u>Id.</u> ¶ 234.)

Mr. Baleja filed a benefit claim initiation form on June 2, 2016.  (<u>Id.</u> ¶ 235.)  Mr. Baleja contested the application of the ESL Offset to his benefit amount.  (<u>Id.</u> ¶ 236.)  Northrop denied Mr. Baleja's claim for benefits without application of the ESL Offset on September 1, 2016.  (<u>Id.</u> ¶ 237.)  Mr. Baleja filed an administrative appeal on September 9, 2016, which was denied on November 11, 2016.  (<u>Id.</u> ¶¶ 238-29.)  Mr. Baleja filed this class action lawsuit on February 8, 2017.  (<u>Id.</u> ¶ 240.)

**B.  Evidentiary Objections**

Both Plaintiff and Defendant make several evidentiary objections.  Because the Court does not consider any objected to evidence in its decision, all evidentiary objections are DENIED as moot.

## III.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325. Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle, 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.   DISCUSSION

Plaintiff argues that the ESL Offset which reduced his pension and the pensions of others is invalid because of: (1) Defective notice of the 1986 Offset (the equitable relief claim); and (2) Cutbacks to the 1986 Plan (the plan benefits claim). (SAC ¶ 12.) Defendants move for summary judgment on all claims. (See Defendants' Motion.) Plaintiff effectively does the same, though his Motion is for "counts one and two," the only counts which have not previously been dismissed by the Court. (See Plaintiff's Motion.)

The merits of both Plaintiff's notice claim and his benefits claim begin with the plan language of the ESL Offset provision from the 1985 TRW Plan. It reads:

D. Computation of Benefits
1. Normal Retirement Benefits. The monthly normal retirement benefit of an eligible Participant shall be computed in the following manner:
    a. 40% of his Earnings;
    b. less 50% of the amount by which the Estimated Primary Social Security Amount exceeds $450.00;

    c. increased by a percentage of his Earnings equal to .5% multiplied by his Years of Benefit Service in excess of 30, or reduced by 1/360th for each month by which the number of his months of Benefit Service is less than 360, if any; and

    d. reduced by the amount listed opposite the Participant's name in Appendix J, said amount representing the age 65 actuarial annuity value of the Participant's account balance accrued under either the [ESL] Retirement Fund or the TRW Microwave Inc. Retirement Account Plan, excluding, for offset purposes, in the case of the ESL Retirement Fund, that portion of the account balance consisting of employee contributions or any amount rolled over from another tax-qualified pension plan.

(Dkt. No. 165-1 ¶ 1.) The question the Court must answer is whether there are genuine disputes of material fact regarding either notice provided to ESL employees or the reasonableness of the plan administrator's interpretation of the ESL Offset.

## A. Defective Notice

The core of Plaintiff's disclosure claim is as follows: ERISA forbids pension plans from misleading participants and beneficiaries. See, e.g., CIGNA Corp. v. Amara, 563 U.S. 421, 440 (2011) (equitable relief available under ERISA to remedy plan's "false or misleading information"); Varity Corp. v. Howe, 516 U.S. 489, 506 (1996) (misrepresentations are breach of fiduciary duty under ERISA). In 1986, Defendants amended the TRW Plan, and, according to Plaintiff, "no one mentioned" to ESL employees "that their future benefits would be offset by 1985 distribution from the ESL Plan." (SAC ¶ 6.)

Defendants first move for summary judgment on this claim on statute of limitations grounds. (Defendants' Motion 12.) Disclosure claims are time-barred if they are brought more than six years from the "last action" which constituted a part of a defendant's breach of fiduciary duty or violation of ERISA or the "latest date on which the fiduciary could have cured the breach or violation." 29 U.S.C. § 1113. In the alternative, the claims may be time-barred three years after "the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113; see also Patterson v. Capital Grp. Cos., 2018 WL 748104, at *2 (C.D. Cal. Jan. 23, 2018) (applying § 1113 to breach of fiduciary duty claim); Bruno v. Time Warner Pension Plan, 534 F. App'x 654, 655 (9th Cir. 2013) (applying § 1113 to SPD disclosure claim).

The only exception to the six-year period of repose is for "fraud or concealment," in which case an "action may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113. The events giving rise to this case all occurred more than 30 years ago. Without the applicability of the "fraud or concealment" exception (or an exceptionally generous understanding of violation), Plaintiff has no disclosure case.

Plaintiff, for his part, fights every part of Defendants' section 1113 analysis. (Plaintiff's Opposition 18-22.) He argues first that Defendants have not adequately moved for summary judgment on Plaintiff's state claims because Defendants' discussion of the state claims was in a

footnote.  (Id. 18 (citing Defendant's Motion 13 n.1.))  He next argues that because Plaintiff's claims are based on active deceit, the relevant sub-section of 1113 is Section 1113(1)(A), which requires claims to be brought six years after "the date of the last action which constituted a part of the breach or violation."  (Plaintiff's Opposition 12 (citing 29 U.S.C. § 1113.))  Given this, Plaintiff argues that the last act which constituted a part of the breach or violation "clearly transpired after 2012," and that acts include the 2014 SPD, "the post-2012 statements and false representations that ESL employees would receive a pension with no offset, the discovery (in 2019) that Defendants had indeed created an Appendix J but applied offset amounts  not  set forth  therein,  and  Defendants' post-2012 false  statements that an 8.5% offset was set forth in the text of the 1985 Plan."  (Id. 21.)  Plaintiff finally argues that the fraud or concealment exception also applies and alleges both fraud and concealment—mostly through the circular argument that all ERISA violations are in some way self-concealing.  (Id. 22.)

Plaintiff is correct that Section 1113(1)(A) applies.  However, he is mistaken about Defendant's burden regarding concealment and fraud.  As Plaintiff ultimately has the burden of proving his case, it is sufficient on summary judgment for Defendants to identify that there is no dispute of material fact regarding a total absence of evidence that Defendants committed fraud or concealment sufficient to revive what would otherwise be a dead cause of action.  Defendants have met that burden.

In sum, the "last action" constituting a potential breach or violation of ERISA was the date the SPD was distributed.  And it cannot be that disclosure violations have indefinite statutes of limitations because there is always more to disclose.  Plaintiff's disclosure claims are time-barred.

## B.  Benefits

Plaintiff's second claim is essentially that interpreting the ESL Offset in a way that substantially (or wholly) cannibalizes class members' pensions is unreasonable.  The question before the Court is one regarding the reasonableness of the plan administrator's interpretation. When an ERISA plan grants discretion to the plan administrator, a court reviews the decision for abuse of discretion, although such review is informed by any conflict of interest appearing in the record.  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 962 (9th Cir. 2006) (en banc).  "Under the deferential abuse of discretion standard of review, the plan administrator's interpretation of the plan will not be disturbed if reasonable."  Day v. AT&T Disability Income Plan, 698 F.3d 1091, 1096 (9th Cir. 2012) (internal quotation marks and citation omitted). "ERISA plan administrators abuse their discretion if they render decisions without any explanation, . . . construe provisions of the plan in a way that conflicts with the plain language of the plan or rel[y] on clearly erroneous findings of fact."  Id. (internal quotation marks and citation omitted).

Plaintiff argues that the language of the Plan is unambiguous, and that "[b]y definition, it is unreasonable to interpret the 1985 Plan in a way that conflicts with the actual language of that plan."  (Plaintiff's Motion 6.)  While Plaintiff is correct that plain language matters, plain

language alone does not solve the question of Defendants' liability.  See Day v. AT&T Disability Income Plan, 698 F.3d 1091, 1096 (9th Cir. 2012) ("ERISA plan administrators abuse their discretion if they . . . construe provisions of the plan in a way that clearly conflicts with the plain language of the plan.")

However, Defendants are equally mired.  They argue that Plaintiff's benefits claim, like his disclosure claim, is time-barred, but have no specific statute of limitations to lean on for guidance.  (Defendants' Motion 23.)  They argue that there was no impermissible cutback on benefits, but there are no undisputed facts to support such a contention.  (Id.)

There is no common understanding of basic facts such as whether Appendix J ever really existed, whether the ESL Offset is at present calculated with an 8.5% interest rate, and if it is, whether the 8.5% interest rate was appropriately disclosed.  Indeed, there remain critical factual questions regarding the appropriate interpretation of the ESL Offset Provision and the 1986 TRW Plan.  There also remain factual questions regarding whether there was a cutback of the Plan in any way—which relates to but does not wholly depend on a determination of whether "Appendix J" exists.  Summary judgment granted to either party would be inappropriate.

## V.    CONCLUSION

For the reasons above, the Court GRANTS-IN-PART and DENIES-IN-PART Defendants' Motion and DENIES Plaintiff's Motion.  Defendants' Motion is granted with respect to Plaintiff's claim for equitable relief that Northrop's 1985 SPD violates ERISA's disclosure requirement.  Defendant's Motion is denied with respect to Plaintiff's other claims.  The March 29, 2021 hearing is VACATED.

**IT IS SO ORDERED.**