1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION
10
11    JOHN BALEJA,                          Case No. EDCV 17-235 JGB (SPx)
12                            Plaintiff,
13              v.
14    NORTHROP GRUMMAN SPACE AND            **FINDINGS OF FACT AND**
15    MISSIONS SYSTEMS CORP. SALARIED       **CONCLUSIONS OF LAW**
16    PENSION PLAN, et al.
17                            Defendants.
18
19
20
21
22
23
24
25
26
27
28

1    Plaintiff John Baleja brought this action on behalf of a class under the
2  Employee Retirement Income Security Act ("ERISA") against Defendants
3  Northrop Grumman Space and Mission Systems Corp. Salaried Pension Plan,
4  Northrop Grumman Benefit Plans Administrative Committee, and Northrop
5  Grumman Corporation (collectively, Defendants).  Defendants are successors to
6  ESL, Inc. ("ESL") and Plaintiffs are former ESL employees.  Mr. Baleja alleges
7  two causes of action under ERISA: first, that Defendants' failure to pay benefits
8  due under the terms of the pension plan violates 29 U.S.C. § 1132(a)(1)(B); and
9  second, that Defendants' plan amendments in 1989, 1996, and other informal
10 amendments diminished class members' accrued benefits in violation of 29 U.S.C.
11 § 1054(g)(1).

12    The case was tried to the Court on January 25, 26, 27, and 28, 2022.  Closing
13 arguments occurred on January 28, 2022.  At the January 28, 2022 closing
14 arguments, the Court ordered supplemental briefing, which was submitted by both
15 sides on March 18, 2022.  ("Pl's Supp Br.," Dkt. No. 242; "Defs Supp Br.," Dkt.
16 No. 241.)  On April 6, 2022, Defendants filed a motion for leave to file a response
17 to Plaintiff's proposed findings of fact and conclusions of law (Dkt. No. 243),
18 which the Court granted on April 8, 2022 (Dkt. No. 244.)  On April 18, 2022,
19 Defendants filed a response to Plaintiff's proposed findings of fact. ("Opp. to Pl's
20 Supp. Br," Dkt. No. 245.)  On May 9, 2022, Plaintiff replied. ("Reply to Pl's Supp.
21 Br.," Dkt. No. 246.)

22    The Court, having considered all the evidence presented by the parties, the
23 written submissions from both sides, and the argument of counsel, issues the
24 following Findings of Fact and Conclusions of Law.
25 //
26 //
27 //
28 //

2

# I.   FINDINGS OF FACT

## A.  The Relevant Pension Plans

1. ESL was a defense contractor that designed and developed data systems for reconnaissance and communications applications.  ("Stip. Facts," Dkt. No. 221 ¶ 1.)  In 1978, TRW, Inc. ("TRW") acquired ESL, which became TRW's wholly owned subsidiary.  (<u>Id.</u> ¶¶ 2, 3.)

2. At the time of ESL's acquisition, it maintained an employee retirement plan called the ESL Retirement Fund (the "ESL Plan").  (<u>Id.</u> ¶ 4.)

3. The ESL Plan was a defined contribution plan under ERISA.  (<u>Id.</u> ¶ 5.)  Pursuant to ESL Plan terms, ESL contributed a fixed percentage of each employee's salary to their respective individual retirement account.  (<u>Id.</u> ¶ 6.)

4. TRW also maintained a retirement plan for its employees (the "TRW Plan").  (<u>Id.</u> ¶ 4.)  The TRW Plan was a defined benefit plan under ERISA. (<u>Id.</u> ¶ 7.)  Under the TRW Plan, a participant's retirement benefit was calculated in accordance with a defined benefit formula, which generated an employee's benefit based on the employee's final average salary and total years of service, among other things.  ("Defs' SOF," Dkt. No. 241-1 ¶ 10.)

## B.  Class Members Transition from the ESL Plan to the TRW Plan

5. In 1984, TRW and ESL elected to terminate the ESL Plan.  (<u>Id.</u> ¶ 12.)

6. The transfer of the plans included: (1) termination of the ESL plan; (2) distribution of the ESL Plan account balances to employees; and (3) amendment of the TRW Plan to incorporate the ESL employees.  (Stip. Facts ¶ 8.)

7. Given that the TRW Plan's benefit formula depended on the "total years of service" variable, TRW had to determine how to calculate ESL employees' total years of service under the TRW Plan. (Defs' SOF ¶ 14.)

8. Two potential methods were considered to calculate ESL employees' total years of service. (Id. ¶ 15.) First, TRW could grant service credit to ESL employees for all their years of service at ESL, which would include their years of service before joining the TRW Plan. (Id. ¶ 15(a).) Second, TRW could grant ESL employees credit only for their years of service at ESL **after** they joined the TRW Plan. (Id. ¶ 15(b).)

9. TRW pursued the first option and granted ESL employees service credit for all their years of service at ESL, which included their pre-integration years of service. (Id. ¶ 16.)

10. However, ESL employees had already accrued and received benefits under the ESL Plan for their pre-integration years of service. (Id.) To avoid the payment of duplicate benefits, TRW determined that an offset should apply to ESL employees' benefits. (Id.) Absent the offset, ESL employees would have received duplicative benefits under two different pension plans—the ESL Plan and the TRW Plan—for the same years of service. (Id.)

11. The ESL Plan was terminated on December 31, 1984. (Id. ¶ 17.)

12. Participants were paid their ESL Plan account balances in the form of lump sum distributions. (Stip. Facts ¶ 17.)

13. The TRW Plan was restated and amended, effective as of January 1, 1985 (the "1985 Plan") to incorporate current ESL employees into the TRW Plan. (Id. ¶ 9.)

14. The 1985 Plan was executed on December 19, 1985, retroactive to January 1, 1985. (Id. ¶ 10.)

15. Employees of ESL who were active participants in the ESL Plan as of December 31, 1984 ("Class Members") were transferred into the 1985 Plan on January 1, 1985.  (Id. ¶ 11.)

16. In 1985, employees of TRW Microwave, Inc. ("Microwave"), another TRW subsidiary, were transferred into the 1985 Plan.  (Defs' SOF ¶ 22.) Same as the ESL employees, the 1985 Plan provided that Microwave employees would receive service credit for their pre-1985 years of service at Microwave, and that an offset would apply to their benefits to account for prior distributions paid out from the Microwave retirement account plan. (Id.)

## C.  ESL Plan Distributions

17. In mid-1985,  ESL Plan account balances were paid out to Class Members as lump sum distributions.  (Id. ¶ 23.)   The "ESL Ledger" or "Cash Out Proof Report" memorialized the distributions to Class Members.  (Id. ¶ 24.)

18. The distributions reflected two amounts: (1) Class Members' account balances under the ESL Plan as of December 31, 1984, in addition to (2) any investment gains or losses after December 31, 1984.  (Id. ¶ 25.)

19. Class Members received their ESL Plan distribution in June 1985.  (Id. ¶ 27.)

20. Post-December 31, 1984 gains were not included in the calculation of the Class Members' ESL Offset amounts.  (Id. ¶ 28.)  Instead, Class Members' ESL Offset amounts were calculated based on Class Members' ESL Plan account balances as of December 31, 1984, the date the ESL Plan terminated.  (Id. ¶ 28.)

//

//

**D.  1985 TRW Plan: Calculations of Class Member Benefits**

21. Under the TRW Plan, Class Members were granted service credit for their years at ESL.  (See supra ¶ 9.)  When a Class Member retired, the final benefit amount calculation depended on all of his or her years of service at ESL, which included his or her years of service before they jointed the TRW Plan.  (Id. ¶ 29.)

22. Under the Plan's benefit formula, a participant's total years of service was one of the primary variables used to determine the benefit amount.  (Id. ¶ 29.)  Thus, Class Members' service credit for their pre-1985 years of service increased their gross benefit amounts under the TRW Plan.  (Id. ¶ 30.)

23. In addition to the service credit under the TRW Plan for pre-1985 years of service, Class Members also received lump sum distributions of their ESL Plan account balances.  (See supra.)  The account balances represented the benefits that Class Members accrued under the ESL Plan for the same pre-1985 years of service for which the TRW Plan also rewarded as service credit.  (Id. ¶ 31.)

24. The TRW Plan terms prohibited the payment of duplicative benefits for the same years of service.  (Id. ¶ 33.)  The 1985 Plan had a "No Duplication of Benefits" Provision, which provided:

> With respect to any Participant, there shall be no duplication of any pension benefits payable under this Plan or any defined benefit or defined contribution plan (other than [t]he TRW Stock Savings Plan) maintained, or contributed to, by any member of the Controlled Group or any predecessor thereof, the amount of which is based in whole or in part on the same period of his employment with any member of the Controlled Group

or any predecessor thereof.  Benefits otherwise payable
with respect to him under this Plan shall be appropriately
reduced (as determined by TRW Inc.) to prevent any
such duplication except to the extent that benefits with
respect to him under such other plan are appropriately
reduced or are stated or clearly intended to be in addition
to benefits under this Plan.

(Id.)

25. ESL was a member of the "Controlled Group" under the 1085 Plan and
thus its employees were subject to the No Duplication of Benefits provision.
(Id. ¶ 34.)

26. The 1985 Plan stated that Class Members' benefits under the TRW Plan
would be reduced by the value of their ESL Plan account balances.  (Id.
¶ 36.)  The 1985 Plan's "ESL Offset Provision" provided that:

The monthly normal retirement benefit of an eligible
Participant shall be reduced by the amount listed opposite
the Participant's name in Appendix J, said amount
representing the age 65 actuarial annuity value of the
Participant's account balance accrued under either the
ESL Retirement Fund or the TRW Microwave Inc.
Retirement Account Plan, excluding, for offset purposes,
in the case of the ESL Retirement Fund, that portion of
the account balance consisting of employee contributions
or any amount rolled over from another tax-qualified
plan.

(Id. ¶ 37.)

//
//

7

**E.  Appendix J**

27.  The 1985 Plan's ESL Offset Provision referred to an "Appendix J."  (Id. ¶ 38.)  There was no evidence that there was ever a final version of Appendix J.  (Id. ¶ 39.)  However, the functional purpose of Appendix J was to set forth the offsets that would apply to Class Members' benefits in order to avoid the payment of duplicative benefits.  (Id. ¶ 40.)

28.  The version of Appendix J relevant here is an incomplete draft which indicates that TRW intended to revise the document to include the offset amounts applicable to Class Members' benefits.  (Id. ¶ 43.)  Appendix J is attached to a cover memorandum dated March 12, 1986, from Jacob Schoeppler, TRW's Director of Retirement Income at the time:

> I enclose a listing of the Microwave people who received
> their account balances as a consequence of terminating
> the Microwave Retirement Account Plan and providing
> coverage under the TRW Salaried Pension Plan.  Our
> intent was to include this material as an Appendix to the
> Salaried Plan and I suggest that be done at the next
> convenient point in time.  I plan to provide you a similar
> list for ESL people as soon as possible.

(Id. ¶ 44.)

29.  In 1985 and 1986, Mr. Schoeppler contacted ESL multiple times to obtain the information he needed to create a final version of Appendix J.  (Id. ¶ 45.)  There is no evidence that he ever received the information he needed from ESL.  (Id.)  As a result, Appendix J was never finalized or incorporated into the TRW Plan.  (Id.)

30.  Three years later, on June 28, 1989, Barbara Nahra, TRW's in-house ERISA counsel, circulated Mr. Schoeppler's March 12, 1986 cover

1    memorandum and a list of Microwave employees to certain TRW

2    personnel.  (Id. ¶ 46.)

3

4  **F.  Implementation of the 1985 Plan**

5    31.  The 1985 Plan provides TRW's Board of Administration with "such powers

6        as are necessary for the proper performance of the following:… (b) finding

7        facts and making determinations as to the rights of any Participant or

8        Beneficiary applying for benefits," and "(f) interpreting the Plan."  (Id.

9        ¶ 51.)

10    32.  The Northrop Grumman Space & Mission Systems Corp. Salaried Pension

11        Plan (the "Northrop Plan"), the successor to the TRW Plan, provides

12        Northrop's Administrative Committee (the "Plan Administrator" under

13        ERISA) with the powers to: (1) "[c]onstrue and interpret the terms of the

14        Plan, including the power to remedy possible ambiguities, inconsistencie[s],

15        or omissions," and (2) "[d]etermine the amount of benefits and authorize

16        payments from the Trust."  (Id. ¶ 52.)

17    33.  The Plan Administrator has consistently interpreted the terms of the 1985

18        Plan to require the application of an ESL Offset to Class Members' benefits.

19        (Id. ¶ 55.)

20    34.  The ESL Offset is called for by both the Plan's No Duplication of Benefits

21        provision, which provides for benefits to be "appropriately reduced" in

22        order to avoid any duplication of benefits, and by the Plan's ESL Offset

23        provision, which provides for a reduction in Class Members' benefits to

24        account for their receipt of prior distributions from the ESL Plan.  (Id. ¶ 56.)

25      **1.  The ESL Offset Provision**

26    35.  The ESL Offset provision of the 1985 Plan states in pertinent part: "the

27        monthly normal retirement benefit of an eligible Participant shall be . . .

28        reduced by the amount listed opposite the Participant's name in Appendix J,

said amount representing the age 65 actuarial annuity value of the Participant's account balance accrued under either the ESL Retirement Fund or the TRW Microwave Inc. Retirement Account Plan."  (Id. ¶ 57.)

36. Although the provision refers to the an Appendix J that was never finalized, the Plan Administrator found that the intent of the provision was clear because it expressly states what the amounts in the intended Appendix J should have represented.  (Id. ¶ 58.)  The 1985 Plan states that Appendix J was intended to list offset amounts "representing the age 65 actuarial annuity value of [a] Participant's account balance accrued under . . . the ESL Retirement Fund."  (Id. ¶ 58.)

37. The language expresses a clear intention to reduce Class Members' benefits under the TRW Plan by an amount equal to the age 65 actuarial annuity value of the distribution that each Class Member received under the ESL Plan.  (Id. ¶ 59.)

38. The Plan Administrator interpreted the 1985 Plan in line with this intention.  (Id. ¶ 60.)  Defendants reduced—or "offset"—Class Members' benefits by "the age 65 actuarial annuity value[s]" of their ESL Plan "account balance[s]."  (Id. ¶ 60.)

39. TRW calculated the ESL Offset under the 1985 Plan using the above methodology: Defendants projected a Class Member's ESL Plan Account balance to age 65 and then converted it to an annuity using a set of actuarial assumptions.  (Id. ¶ 62.)

40. Defendants' methodology accords with standard actuarial practice.  (Id. ¶ 63.)  After the ESL Plan terminated, Class Members received their ESL Plan account balances in the form of lump sum distributions.  (Id.)  Under the TRW Plan, however, Class Members were entitled to receive their benefits as annuities payable at retirement.  (Id.)  When applying a pension offset, one cannot subtract a one-time lump sum distribution amount from a

monthly annuity amount because they are not equivalent forms. (Id.) One can only subtract a monthly annuity amount from another monthly annuity amount. (Id.) Thus, before an offset can be applied to a benefit, both the offset and the benefit must be expressed in the same form. (Id.) In addition, the offset must account for the different times at which payment is made. (Id.) Given the time value of money, a lump sum paid in 1985 would have a different and greater value years later upon a participant's retirement. (Id.) The process of converting one form of benefit (a lump sum paid in 1985) into another form of benefit paid later in time (an annuity payable at retirement) is called an "actuarial equivalent" calculation. (Id.)

41. The ESL Offset is an actuarial equivalent calculation. (Id. ¶ 64.) It involves the conversion of a Class Member's lump sum distribution from the ESL Plan in 1985 into an actuarially equivalent monthly annuity amount calculated as of the Class Member's normal requirement age. (Id.) This monthly annuity amount can then be subtracted from a Class Member's gross monthly annuity benefit to arrive at the Class Member's final benefit amount. (Id.) This is how Defendants calculated the ESL Offset under the 1985 Plan. (Id.)

## 2. No Duplication of Benefits Provision

42. Defendants' application of the ESL Offset to Class Members' benefits under the 1985 Plan was also consistent with the Plan's No Duplication of Benefits provision. (Id. ¶ 65.)

43. The No Duplication of Benefits provision mandates that "there shall be no duplication of any pension benefits payable under this Plan or any . . . defined contribution plan . . . the amount of which is based in whole or in part on the same period of his employment." (Id. ¶ 66.) To avoid such duplication, the provision requires that "[b]enefits otherwise payable . . .

1   under th[e] Plan shall be appropriately reduced (as determined by TRW
2   Inc.) to prevent any such duplication."  (Id.)

3   44. In order to "appropriately reduce[]" the annuity payable under the TRW
4   Plan to account for the lump sum distributions that Class Members received
5   under the ESL Plan, it was necessary to perform the same type of actuarial
6   equivalent calculation called for in the Plan's ESL Offset provision—
7   deriving the actuarial annuity value at retirement of the lump sum
8   distributions that Class Members received from the ESL Plan in 1985.  (Id.
9   ¶ 67.)

10  45. The Plan Administrator interpreted the 1985 Plan's No Duplication of
11  Benefits provision as requiring the application of the ESL Offset.  (Id. ¶ 68.)

12  **3.  Contemporaneous Evidence of Intent to Apply Offset**

13  46. In a July 10, 1984 letter, TRW's George Solomon relayed to TRW's Board
14  of Administration that ESL "wishes to begin participation in the TRW
15  Salaried Pension Plan effective January 1, 1985."  (Id. ¶ 70.)  In his letter to
16  the Board, Mr. Solomon stated that ESL intended to accomplish this
17  transition in plans by "terminat[ing] their existing ESL Retirement Fund,
18  pay[ing] out the individual accounts to the participants, and us[ing] those
19  balances as offsets to the benefits in the TRW Salaried Pension Plan."  (Id.)

20  47. In 1984, TRW distributed a summary plan description ("SPD") to "[a]ll
21  ESL employees," which provided information about the transition from the
22  ESL Plan to the TRW Plan.  (Id. ¶ 70(b).)  The so-called "1985 SPD"
23  informed Class Members that "the monthly pension benefit which could be
24  provided to you at age 65 by the terminated plan's account balance will
25  offset (serve to reduce) the amount produced by the plan's normal
26  retirement benefit formula."  (Id.)

27  48. Around the same time, TRW distributed an "ESL Pamphlet" to Class
28  Members.  (Id. ¶ 70(c).)  The Pamphlet similarly informed Class Members

12

that "the monthly pension benefit which could be provided to you at age 65 by the terminated plan's account balance will offset (serve to reduce) the amount produced by the plan's normal retirement benefit formula."  (Id.)

49. In April 1985, ESL's James Sandstrom distributed a memorandum to Class members regarding their "ESL Retirement Fund Distribution[s]."  (Id. ¶ 70(d).)  The memorandum explains that the "age 65 annuity value" of a Class Member's distribution would be used as an "offset against the normal retirement benefit that you will earn under the TRW Salaried Pension Plan."  (Id.)  The memorandum further provided Class Members with the data necessary to calculate their ESL Offset amounts based on their estimated ESL Plan account balances.  (Id.)

50. The TRW Plan has been interpreted and applied consistently since 1985 to require the application of an offset to Class Members' benefits.  (Id. ¶ 71.)

51. There is no evidence in the history of the TRW Plan that Defendants failed to apply an offset to reduce the benefits of Class members who received lump sum distributions from the ESL Plan.  (Id. ¶ 72.)

**G.  The Actuarial Assumptions Used to Calculate the ESL Offset**

    **1.  Interest Rate and Mortality Assumption**

52. The calculation of the ESL Offset requires the use of actuarial assumptions: those relevant here are the interest rate and mortality assumptions.  (Id. ¶ 73.)

53. The Plan Administrator interprets the 1985 Plan to require the use of the interest rate and mortality assumptions supplied in the Plan's definitions of "Actuarial Equivalent" and "Interest."  (Id. ¶ 74.)

54. The Plan's definition of Actuarial Equivalent states that:

        "Actuarial Equivalent" means a benefit having an equal value when computed on the basis of an eight and one-

half percent (8-1/2%) interest assumption and on the 1971

Group Annuity Mortality Table adjusted to a unisex basis

for a Participant population deemed to be two-third (2/3)

male and one-third (1/3) female.

(Id. ¶ 75.)

55. The ESL Offset provision does not expressly reference this defined term. However, the parties' actuarial experts agree that it was reasonable for Defendants to have relied on the term to provide the interest rate and mortality assumptions necessary to calculate the ESL Offset, in the absence of any other provision specifying the necessary assumptions.  (Id. ¶ 76.) The ESL Offset is an actuarial equivalent calculation, thus it was reasonable to use the Plan's definition of Actuarial Equivalent for the purpose of calculating the offset.  (Id.)

56. In addition to the definition of Actuarial Equivalent, the 1985 Plan also contains a definition of "Interest," which species that "for periods after January 1, 1981 and until determined otherwise," the Plan's defined interest rate is "eight and one-half percent (8-1/2%)."  (Id. ¶ 77.)

57. In practice, the ESL Offset was calculated under the 1985 Plan using an 8.5% interest rate assumption.  (Id. ¶ 78.)  This was consistent with the 1985 Plan's definitions of Actuarial Equivalent and Interest.  (Id.)

58. The ESL Offset was calculated under the 1985 Plan using the 1971 Group Annuity Mortality Table adjusted to a unisex basis for a Participant population deemed to be two-third (2/3) male and one-third (1/3) female. (Id. ¶ 79.)  This was consistent with the 1985 Plan's definition of Actuarial Equivalent.  (Id.)

59. The 1985 Plan terms did not compel the application of a different interest rate or mortality assumption for purposes of calculating the ESL Offset.  (Id. ¶ 80.)

14

### 2. COLA Assumption

60. In addition to the interest rate and mortality assumption, a third actuarial assumption was necessary to calculate the ESL Offset under the 1985 Plan: an assumed cost-of-living adjustment ("COLA").  (Id. ¶ 81.)

61. A COLA assumption was necessary to calculate the ESL Offset under the 1985 Plan because benefits payable under the Plan were subject to a COLA.  (Id. ¶ 82.)

62. Under the 1985 Plan, the annual COLA applicable to a participant's benefit was a number between 0% and 4%, depending on the annual change in the Consumer Price Index.  (Id. ¶ 83.)

63. The COLA assumption used to calculate the ESL Offset fell within this range.  Specifically, the COLA assumption used to calculate the ESL Offset was 3%.  (Id. ¶ 84.)

64. The 3% COLA assumption was not specified in the 1985 Plan document but was supplied by TRW's Board of Administration.  (Id. ¶ 85.)

65. The 1985 Plan vested the Board of Administration with the authority to supply the COLA assumption necessary to calculate the ESL Offset because the Plan gave the Board "such powers as are necessary for the proper performance of:…. (b) finding facts and making determinations as to the rights of any Participant or Beneficiary applying for benefits," and "(f) interpreting the Plan."  (Id. ¶ 86.)

66. All three actuarial assumptions—interest rate, mortality, and COLA—were used by TRW from the outset of the 1985 Plan.  (Id. ¶ 88.)

### H. The Microwave Offset

67. In addition to the ESL Offset, the 1985 Plan provided for an offset for the benefits of the Microwave employees, who were enrolled in the TRW Plan at the same time as Class Members.  (Id. ¶ 89.)

15

68. The 1985 Plan's governed the calculation of benefits for both Class Members and Microwave employees.  (Id. ¶ 90.)  Specifically, the 1985 Plan provided that the benefits of each group would be:

> Reduced by the amount listed opposite the Participant's name in Appendix J, said amount representing the age 65 actuarial annuity value of the Participant's account balance accrued under either the ESL Retirement Fund or the TRW Microwave Inc. Retirement Account Plan, excluding, for offset purposes, in the case of the ESL Retirement Fund, that portion of the account balance consisting of employee contributions or any amount rolled over from another tax-qualified plan.

(Id.)

69. The Microwave Offset amounts in the draft Appendix J were calculated using: (a) an 8.5% interest rate; (b) the 1971 Group Annuity Mortality Table adjusted to a unisex basis for a Participant population deemed to be two-third (2/3) male and one-third (1/3) female; and (c) a 3% COLA assumption. (Id. ¶ 91.)  These are the same actuarial assumptions used to calculate the ESL Offset under the 1985 Plan.  (Id.)

## I.   The ESL Offset Calculation Methodology is Consistent with Prevailing Industry Practice

### 1.  Service Credit

70.   When an acquired workforce is enrolled in a company's existing pension plan, it is common to provide the acquired workforce with service credit under the plan for employees' years of service at the acquired company. (Id. ¶ 93.)

71. Granting employees of an acquired workforce with service credit for their prior years of service can result in the transitioned employees' receipt of greater benefits under the new plan as compared to a so-called "new-hire" approach. (Id. ¶ 94.)

72. When a company elects to provide an acquired workforce with past service credit, it is also common to provide for an offset to those employees' benefits to account for the value of any benefits they earned for the same period of service under a prior pension plan. (Id. ¶ 95.)

73. Absent application of an offset, acquired employees would earn duplicative benefits under multiple pension plans for the same period of service. (Id. ¶ 96.)

**2. Interest Rates**

74. Defendants' use of an 8.5% interest rate to calculate the ESL Offset was reasonable in light of prevailing market rates in and around 1985. (Id. ¶ 97.)

75. In pension offset design, an interest rate assumption is generally based on the long-term market interest rates that prevail at the time of the offset's introduction. (Id. ¶ 98.)

76. Long-term Treasury and corporate bond rates typically serve as benchmarks for choosing an interest rate assumption. (Id. ¶ 99.) Actuaries consider long-term rates to be more appropriate in the selection of an interest rate assumption because pension offsets are intended to serve as a proxy for long-term investments. (Id.)

77. It is also common industry practice to "lock in" an interest rate assumption based on market conditions that prevail at the time of the offset's introduction. (Id. ¶ 100.) When an offset is introduced, a plan sponsor does not know whether prevailing market rates will increase or decrease over time. Locking in a fixed interest rate assumption provides certainty for both the plan sponsor and participants. (Id.)

17

78. The fixed interest rate used to calculate the ESL Offset was 8.5%, which was significantly lower than prevailing Treasury and corporate bond rates at the time of the Offset's introduction.  (Id. ¶ 101.)  In 1984, the average 10-year and 30-year Treasury rates were in excess of 10% for the year, which was not an anomaly for the early 1980s.  (Id.)

79. The decision to adopt an interest rate assumption that was lower than prevailing market rates resulted in lower offset amounts for Class Members as compared to what their offsets would have been if the interest rate was tied to prevailing rates in 1985.  (Id. ¶ 103.)

80. However, interest rates **after** 1985 could not have informed the interest rate applied to the ESL Offset because future rates were not known.  (Id. ¶ 104.)

## J.   The 1989 TRW Plan

81. On December 20, 1989, the TRW Plan was amended and restated, effective as of January 1, 1989.  (Id. ¶ 108.)

82. The 1989 Plan adopted a revised benefit formula that was intended to provide participants with generous pension benefits.  (Id. ¶ 109.)

83. In implementing the revised benefit formula, the 1989 Plan eliminated the COLA applicable to participants' benefits.  (Id. ¶ 110.)  As a result, a COLA assumption was no longer used to calculate the ESL Offset after January 1, 1989.  (Id.)

84. In addition to eliminating the COLA, the 1989 Plan revised the language used to describe the ESL Offset to eliminate the reference to the incomplete Appendix J but did not alter the remainder of the provision.  (Id. ¶ 111.)

85. The 1989 Plan stated that the Class Members' benefits under the Plan:

> Shall be reduced by the amount which represents the age 65 actuarial annuity value of the Participant's account balance under the ESL Retirement Fund excluding, for

18

offset purposes, that portion of the account balance

consisting of employee contributions or any amount

rolled over from another tax-qualified pension plan.

(Id. ¶ 112.)

86. The interest rate and mortality assumptions used to calculate the ESL Offset under the 1989 Plan were the same as those used to calculate the ESL Offset under the 1985 Plan.

## K. Commencement of Benefits

87. At least 781 Class Members commenced benefits before February 8, 2013. (Id. ¶ 144.)

## L. Plaintiff John Baleja

88. Plaintiff John Baleja began working for ESL in 1982. (Stip. Facts ¶ 27.) He was a participant in the ESL Plan. (Id. ¶ 28.)

89. After the ESL Plan terminated, Mr. Baleja received a $4,078.14 cash payout in 1985. (Id. ¶ 29.)

90. Mr. Baleja became a participant in the TRW Plan as of January 1, 1985. (Id. ¶ 30.)

91. Mr. Baleja's ESL Offset was calculated using an 8.5% interest rate. (Id. ¶ 31.)

92. Mr. Baleja received the 1985 SPD. (Def's SOF ¶ 155.)

93. Mr. Baleja received the ESL Pamphlet. (Id. ¶ 156.)

94. Mr. Baleja received the 1985 Plan document. (Stip. Facts ¶ 37.)

95. Mr. Baleja did not receive a copy of Appendix J. (Def's SOF ¶ 158.)

96. In 1994, Mr. Baleja's employment with TRW was terminated. (Stip. Facts ¶ 41.)

97. In 1995, Mr. Baleja received a DVR notice.  (Def's SOF ¶ 160.)  The DVR notice stated, "Your age 65 benefit will be subject to reduction for the ESL prior plan benefit."  (Id. ¶ 161.)  Mr. Baleja did not contest the application of the ESL Offset to his benefit in 1995.  (Id. ¶ 162.)

## II.    CONCLUSIONS OF LAW

### A.  Defendants Did Not Deny Benefits Due Under the Plan.

1. 29 U.S.C. §  1132(a)(1)(B) provides that a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Denials of benefits under this provision are "to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Moyle v. Liberty Mut. Retirement Ben. Plan, 823 F.3d 948, 956 (9th Cir. 2016) (quoting Firestone v. Bruch, 489 U.S. 101, 115 (1989)).

2. To evaluate the reasonableness of a plan administrator's interpretation, the Court "do[es] not search for the best interpretation of a plan or even for one [that it] might independently adopt."  Eckelberry v. Reliastar Life Ins. Co., 469 F.3d 340, 343 (4th Cir. 2006).  Instead, the plan administrator's interpretation controls "unless it is (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record."  Stephan v. Unum Life Ins. Co. of Am., 697 F.3d 917, 929 (9th Cir. 2012) (internal quotations and citation omitted).

3. The 1985 Plan granted TRW's Board of Administration the authority to interpret the Plan and determine the benefits among participants or

20

beneficiaries.  The Northrop Plan similarly granted Northrop's Administrative Committee the authority to determine its Plan and determine the benefit amount payable.

4.  This Court determined that the deferential standard of review applied to this case at summary judgment.  <u>Baleja v. Northrop Grumman Space & Mission Sys. Corp. Salaried Pension Plan</u>, 2021 WL 2497931, *10 (C.D. Cal. Mar. 26, 2021) (citing <u>Day</u>, 698 F.3d at 1096).

5.  Plaintiff argues that the 1985 Plan "does not grant Defendants authority to resolve ambiguities in the Plan."  (Pl's Supp. Br. ¶ 56.)  On the contrary, the Court found that the 1985 Plan provides TRW's Board of Administration with "such powers as are necessary for the proper performance of the following: . . . (b) finding facts and making determinations as to the rights of any Participant or Beneficiary applying for benefits," and "(f) interpreting the Plan."  (<u>See</u> <u>supra</u> ¶ 31.)  Thus, the 1985 Plan granted Defendants the authority to resolve ambiguities in the Plan.

6.  The ESL Offset Application was a reasonable interpretation of the 1985 Plan, which explicitly provided for no duplication of benefits.  Defendants effectuated that intent through their interpretation of the ESL Offset provision, which provided that the Class Members' benefit would be reduced by the amount listed opposite the Participant's name in Appendix J, said amount representing the age 65 actuarial annuity value of the Participant's account balance accrued under the ESL Retirement Fund.

7.  The "No Duplication of Benefits" provision mandated that "there shall be no duplication of any pension benefits payable under this Plan or any . . . defined contribution plan . . . the amount of which is based in whole or in part on the same period of his employment."  The application of an offset was necessary to avoid duplicative benefits for the same years of service, which would violate the Plan.

8. Although a final Appendix J was never issued, Defendants interpreted the 1985 Plan in accordance with the second clause of the provision, which defined the offset amount applicable to each Class Member's benefit as "the age 65 actuarial annuity value of the Participant's account balance accrued under . . . the ESL Retirement Fund." See supra.

9. This interpretation was reasonable, and both parties' experts agreed that the Offset-defining clause directed an actuary to project a Class Member's account balance to age 65, then convert it to an annuity through actuarial assumptions.

10. The absence of a final Appendix J did not weigh in favor of concluding that no Offset applied given the "No Duplication of Benefits" provision.

11. The use of an 8.5% interest rate to calculate the ESL Offset was a reasonable interpretation of the 1985 Plan. The Parties' experts agreed that the calculation of the ESL Offset is an "actuarial equivalent" calculation. It was reasonable for Defendants to look to the Plan's definition of "Actuarial Equivalent" to determine the actuarial assumptions necessary to calculate the offset. The definition specified that actuarial equivalent calculations, like the ESL Offset, are to be performed using an 8.5% interest rate.

12. Section 4.1 of the plan did not guarantee a Class Member a benefit of "$20.00 for each Year of Benefit Service." Rather, it guaranteed a Class Member a benefit of "$20.00 for each Year of Benefit Service" that would be "reduced . . . to reflect the value of the Participant's distribution from the ESL Fund . . ." Plaintiff did not introduce evidence that any Class Member received less than this amount, thus this theory of liability fails as well.[1]

---

[1] Plaintiff raises this theory of liability for the first time in his Proposed Findings.

**B.  Defendants Did Not Violate ERISA's Anti-Cutback Provision.**[2]

13.  29 U.S.C. section 1054(g)(1) provides that a plan may not be decreased by an amendment if the amendment (1) eliminates or reduces an early retirement benefit or a retirement-type subsidy (as defined in regulations), or (b) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.  See 29 U.S.C. § 1054(g)(1).

14.  To determine whether a plan amendment cuts back a participant's accrued benefit, one must compare (i) the benefit that the participant is currently receiving, with (ii) the benefit that he or she had accrued under the previous plan formula as of the date of the plan amendment.  If the participant is currently receiving a benefit that is greater than the benefit that he or she had accrued as of the date of the plan amendment, there is no cutback violation.  See, e.g., Cent v. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 747 (2004).

15.  Plaintiff argues that the 1985 Plan did not provide for an ESL Offset, the TRW Plan was amended after 1985 to then introduce the ESL Offset, and the post-1985 amendment decreased his, and other Class Members', "accrued benefit."

16.  As stated above, the Court finds that the 1985 Plan provided for an ESL Offset; there is no evidence to establish that the Plan was later amended to then introduce an ESL Offset.

17.  The anti-cutback rule protects benefits that have accrued as of the date of a plan amendment but **does not prevent a plan sponsor from amending a plan which may reduce future benefits not yet accrued**.  See Heinz, 541

---

[2] In light of the Court's decision that Plaintiff fails on both of his causes of action, the Court declines to decide whether the statute of limitations barred the action or whether certain Class Members have released their claims.

U.S. at 747 ("employers are perfectly free to modify the deal they are offering employees, as long as the change goes to the terms of compensation for continued, future employment" under the anti-cutback rule).

18. Plaintiff did not offer any evidence which compares any Class Member's benefit to his or her accrued benefit as of the date of the ESL.  As a result, Plaintiff cannot prove a violation of the anti-cutback rule.

19. The elimination of the post-retirement COLA in the 1989 Plan was through the adoption of a new benefit formula intended to provide participants with more generous benefits.  Benefits under the 1989 Plan were generally greater than they were under the 1985 Plan.  The 1989 Plan also included language to ensure that no participant's accrued benefit was cut back as a result of the post-retirement COLA elimination.

20. After the 1989 Plan Amendment, TRW implemented a system that compared a Class Member's net benefit under the 1985 Plan to the net benefit the participant became entitled to after the 1989 Plan.  Plaintiff's expert conceded that the analysis performed showed that the 1989 Plan formula did not cut back his accrued benefit.  Critically, Plaintiff again did not compare any Class Member's benefit to his or her accrued benefit immediately before the 1989 Plan.

21. Further, under ERISA, only formal amendments to a pension plan give rise to cutback violations.  29 U.S.C. § 1054(g)(1) ("The accrued benefit of a participant under a plan may not be reduced by an **amendment** of the plan . . . ") (emphasis added); see also Oster v. Barco of Calif. Emps' Ret. Plan, 869 F.2d 1215, 1221 (9th Cir. 1988) ("Congress did not **state** that any change would trigger [anti-cutback] provisions; it stated that any change **by amendment** would do so.") (citation omitted) (emphasis in original))).  The administrative alterations at issue did not arise under any Plan **amendment** and are thus not actionable.  Further, rounding convention changes are also

24

not actionable.  <u>See</u> 26 C.F.R. § 1.411(d)-4, Q&A 4 (explaining that changes
with respect to the ministerial or mechanical administration of the plan do
not implicate protected benefits and thus do not give rise to anti-cutback
violations).

Dated: October 13, 2022

_____

THE HONORABLE JESUS G. BERNAL
United States District Judge